**IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 18 CR 088** |
| **v.** | ) | |
| | ) | **Judge Manish Shah** |
| **LUKE WIERSMA** | ) | |

### Defendant Luke Wiersma's Sentencing Memorandum

Mr. Wiersma stands before this Court after pleading guilty to one count of transmitting a threat and one count of intimidating and interfering with employees of a provider of reproductive health services. He accepts responsibility for his actions and is prepared to serve a just sentence. As the memorandum below lays out, there are substantially mitigating circumstances present in Mr. Wiersma's case that weigh in favor of a non-incarcerative sentence. Mr. Wiersma, by the Federal Defender Program and its attorney, Amanda G. Penabad, therefore requests that the Court impose a sentence of twelve months' home detention.

### Procedural Background

Mr. Wiersma does not dispute the facts related to the offense as they are recounted in the PSR. (PSR ¶¶ 10 - 14) As relevant here, in 2017 and 2018, Mr. Wiersma visited the websites of two Chicagoland and Northwest Indiana clinics and submitted a number of threats to those clinics through their websites. Mr. Wiersma's threats contained anti-abortion rhetoric and religious tones, and threatened to blow up

the clinics.

On February 6, 2018, Mr. Wiersma was arrested by federal agents. A week later, he was released on bond with certain conditions. Dkt. 8. On November 6, 2018, Mr. Wiersma pleaded guilty to Counts 5 and 6 of the indictment pursuant to a plea agreement, which contemplated a guidelines range of 12 to 18 months. Dkt. 46. The PSR in this matter calculated a guidelines range of 24 to 30 months, which Mr. Wiersma disputes in further detail below.

GUIDELINE DISPUTES

The plea agreement in this matter contemplated an offense level of 13 and a criminal history category of I. The Probation Office has recommended the application of an enhancement, not contemplated in the Plea Agreement, for substantial disruption of public services under §2A6.1(b)(4)(A). This enhancement reads: "If the offense resulted in (A) substantial disruption of public, governmental, or business functions or services … increase by 4 levels." Mr. Wiersma objects to the application of this enhancement.

Section 2A6.1(b)(4)(A) does not explicitly set out a standard or test for determining whether the disruption was caused by the actions of the defendant. The language of the enhancement simply states that the enhancement should apply if the offense "resulted in" substantial disruption. Because the Guidelines and application notes do not offer a standard or definition of "resulted in," the phrase should be given its ordinary meaning. *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). As

the Supreme Court has recognized, "it is one of the traditional background principles 'against which Congress legislate[s],' … that a phrase such as 'results from' imposes a requirement of but-for causation." *Burrage v. United States*, 571 U.S. 204, 214 (2014) (internal citation omitted); *id.* at 212 ("Where there is no textual or contextual indication to the contrary, courts regularly read phrases like "results from" to require but-for causality"). In keeping with this directive, the Court should apply an analysis of "but-for" causation to determine whether this enhancement applies.

"But-for" causation requires that, in order to apply the enhancement, Mr. Wiersma's actions must be an "independently sufficient cause" of the disruption. *Burrage*, 571 U.S. at 218. That strict standard means that even actions which are "substantial" or "contributing" factors of the disruption do not trigger the enhancement. *Id.* at 215. Unless the government proves that the Indiana Clinic would have remained open in the absence of the threats, the threats were not an "independently sufficient cause" of the disruption. *Id.* at 218.

The government has failed to meet that burden. The online threats transmitted to the Indiana Clinic were not an independently sufficient cause of the Clinic's short closure. The report of the April 9th interview of the director of the Clinic conducted by the government's agent demonstrates that although threats were made on October 15, 20, and 29, 2017, there was no plan in place as of November 1, 2017 to close the Clinic as a result of those threats. Only after an unrelated shooting on or about November 1, 2017 did the Clinic administration make the decision to temporarily

close the Clinic. The government has not presented evidence demonstrating that the Clinic would have closed simply as a result of the threats.

On either the evening of November 1, 2017 or the early morning of November 2, 2017, an individual *other than Mr. Wiersma* fired a gun at the clinic, shattering a window in a room where two staff members normally sat.[1] While the staff at the Clinic were concerned about the threats prior to that date, Thursday, November 2nd was the first day that the director sent staff members home and directed them not to return to the Clinic in an effort to assure their safety. Per the government's report, after the shooting incident, the staff became "more fearful" for their safety.

Only after the bullet was fired at the Clinic did the administration "escalate" their planning as to how to handle the threats to the Clinic. Per the report of the April 12th interview of the same director, some members of the administration believed the clinic should have remained closed until law enforcement could assure the Clinic was safe. The additional threat over the weekend reportedly did further alarm staff members, but it was the event of the gunshot that first caused the Clinic to send personnel home with the directive not to return, as evidenced by the timeline described the government's report. The gunshot was therefore critical to the closure decision. The threats alone would not have closed the clinic, as evidenced by the clinic's continued operation over the two weeks when it received multiple threats.

The Court should therefore decline to apply the four-point enhancement under

---

[1] Upon the Court's request, Mr. Wiersma will deliver a copy of any relevant discovery items under separate cover to chambers.

§2A6.1(b)(4)(A). Without the enhancement, the final offense level is 13, which yields a guideline range of 12 to 18 months.

SECTION 3553(A) DISCUSSION

As this Court is well aware, after *Booker*, the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) when imposing sentence. *United States v. Booker*, 543 U.S. 220, 245 (2005). After considering the factors, the Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. 18 U.S.C. § 3553(a) (emphasis added). This parsimony provision serves as the "overarching" command of the statute. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007). In this case, a within-guideline sentence of time served meets the §3553(a) goals of sentencing.

**I.    Mr. Wiersma's Personal Characteristics, Medical Conditions, and History of Substance Abuse Offer Significant Insight into His Lack of Judgment in this Case— 18 U.S.C. § 3553(a)(1)[2]**

---

[2] Pursuant to the Court's order dated November 6, 2018, and Local Rule 5.8, Mr. Wiersma has filed this redacted version of his sentencing memo.





██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████









## II. Mr. Wiersma Lack of Criminal History or Disposition to Violence Demonstrates that He Does Not Present a Future Risk — 18 U.S.C. § 3553(a)(2)(B), (a)(2)(C).

This offense is Mr. Wiersma's first felony conviction. With the exception of a misdemeanor offense for damage to property sixteen years ago when he was 18 years old, Mr. Wiersma has never had significant contact with law enforcement. This offense was an aberration in Mr. Wiersma's life, fueled in large part by his alcoholism, and is not indicative of Mr. Wiersma's disposition in the future.

The Sentencing Commission has often studied the correlation between criminal history and recidivism. A 2017 study found that, within CHC I, those individuals with zero criminal history points had a 10% lower reconviction rate (17.4%) that even those with one criminal history point (28.8).[6] A 2004 study on Recidivism and the First Offender broke down individuals with zero criminal history points into further

---

[6] USSC, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, March 2017, at A-7. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/ 20170309_Recidivism-CH.pdf

subgroups.[7] In the language of the study, Mr. Wiersma falls either into "Group C" (individuals with prior convictions, but only minor offenses listed in guideline §4A1.2(c)(2) that never count toward criminal history points) or the residual group of other zero-point offenders. According to that study, only 2.9% of individuals in Group C were re-convicted of another offense, and only 5.2% of offenders in the residual group were re-convicted.

Mr. Wiersma's lack of criminal history is also relevant because he has never spent time in custody or under rigorous supervision before. His previous misdemeanor was so minor that it resulted in court supervision. In contrast, Mr. Wiersma spent a week in federal prison at the beginning of this case, followed by five months of strict home incarceration. Since July 2018, Mr. Wiersma has been on home detention, with movement only for treatment, work, and religious services. Although certainly not as restrictive as incarceration, the band on Mr. Wiersma's ankle has served as a daily reminder of his transgression and the consequences of his reckless actions. Among other things, these strict conditions over the past year-plus have been a sufficient deterrent to convince Mr. Wiersma that he will never engage in conduct contrary to law again.

---

[7] USSC, *Recidivism And The "First Offender"*, May 2004 at 14, https://www.ussc.gov/sites/default/ files/pdf/research-and-publications/research-publications/2004/ 00405_Recidivism_First_ Offender.pdf

### III. Mr. Wiersma's Exemplary Conduct on Bond, Demonstrates that He Does Not Present a Future Risk — 18 U.S.C. § 3553(a)(2)(B), (a)(2)(C).

In addition, Mr. Wiersma has been on pretrial release since February 2018. In those fourteen months, Mr. Wiersma has not had a single violation report. He has attended substance abuse treatment and, despite his significant struggles with addiction in the past, has stayed clean for over a year. In addition to his court-ordered treatment, Mr. Wiersma has sought out AA and NA meetings, as well as a church-based substance abuse program, to supplement his recovery process and build a sustainable network of support once pretrial services are no longer available. He has participated in mental health services, and credits his therapy with helping him examine some of the events of his life that have led to dysfunction. Mr. Wiersma's active participation in the provided pretrial services and his proactive efforts to find lifelong support mechanisms to help him battle substance abuse and depression demonstrate that he is committed to recovery.

While on pretrial release, Mr. Wiersma obtained a job and has been promoted, a sign of his dedicated work ethic. His employer has indicated that Mr. Wiersma is an excellent employee and that he may return to the job after any period of incarceration or alternative sentence. *See* Letter from David Hensley. As his work history in the PSR demonstrates, Mr. Wiersma has consistently worked since the age of seventeen. See PSR at ¶102-111. When he was employed in seasonal jobs, Mr. Wiersma always bridged the off-seasons with supplemental work instead of relying on unemployment

subsidies. As noted in the PSR, Mr. Wiersma's other prior employers have confirmed his work ethic, both through their statements and consistent decisions to rehire Mr. Wiersma each season. See PSR at ¶106. Additionally, Mr. Wiersma has expressed interest in learning a trade to enhance his future job prospects. He has indicated that he would be extremely interested in job training in the BOP, or would pursue an apprenticeship course in welding through a friend in the community. *See* Letter from Jessica Wiersma. As the Court is well aware, employment is significantly correlated with a reduced recidivism risk. *See, e.g., Whitepaper: Integrated Reentry and Employment Strategies: Reducing Recidivism and Promoting Job Readiness*, Le'Ann Duran, Martha Plotkin, Phoebe Potter, Henry Rosen (Council of State Governments Justice Center, 2013).

When he is not working, Mr. Wiersma aids his family by providing child care for his sister's two children, ages 4.5 and 2.5. *See* Letter from Jessica Wiersma. He enjoys close relationships with the other members of his household, and has a strong support network. Although his family was initially shocked at his conduct, they have remained supportive during his time on pretrial release. PSR at ¶65. Because Mr. Wiersma's bond conditions include stringent restrictions on access to the internet, the family initially maintained two separate residences to accommodate Luke. When the financial burden became too much, the various members of the family accepted restrictions on their own use of devices in order to allow Luke to live in the family home. His friends and church community have also provided significant support over

the past year-plus, and Mr. Wiersma has actively sought to strengthen his community support network.

Finally, Luke's letter to the Court provides insight into the depth of reflection Luke has engaged in since his arrest and his significant personal growth. He truly recognizes the breadth of the harm and fear he caused, and is committed to proving to this Court that he will never engage in such behavior ever again.

## PROPOSED CONDITIONS OF SUPERVISED RELEASE

Mr. Wiersma has no objection to the mandatory conditions of supervised release. Mr. Wiersma likewise has no objection to the discretionary conditions of supervised release, with the exception of Proposed Discretionary Condition #23:

- Mr. Wiersma objects to Proposed Condition 23. For over 14 months on pretrial release, Mr. Wiersma has refrained from the use of any electronic devices connected to the internet. He has had no violation reports and there is no evidence that this continued condition is necessary to protect the victims of this offense or the public at large.

  Furthermore, the language of Proposed Discretionary Condition 23 is overbroad and, if it were imposed, should be amended to balance the constitutional rights of Mr. Wiersma and his family members and the goal of protection of the public. The Seventh Circuit has held that "sentencing judges should impose conditions of supervised release which are (a) appropriately tailored to the defendant's offense, personal history and characteristics; (b)

involve no greater deprivation of liberty than is reasonably necessary to achieve the goals of deterrence, protection of the public, and rehabilitation; and (c) sufficiently specific to place the defendant on notice of what is expected." *United States v. Kappes*, 782 F.3d 828, 847 (7th Cir. 2015). The proposed condition fails this test for multiple reasons. First, there is no nexus between Mr. Wiersma's offense and a condition to search his "person, property, house, residence, vehicle, papers…[] or office" to find evidence of a violation of any condition of supervised release. It is therefore not narrowly tailored to the offense. The offense did not involve evidence of threats on Luke's person, property, vehicle, etcetera, nor would an officer be likely to find evidence of electronic submissions through a search of these locations. Second, the condition is not narrowly drawn so as to not involve an unreasonable deprivation of liberty, as it casts an overbroad net. Finally, practically speaking, Mr. Wiersma lives in his family home with seven other adults and two children. This condition unnecessarily infringes on their Fourth Amendment rights and right to privacy.

With regard to "computers, other electronic communications or data storage devices or media," any such condition should be amended to make clear that it does not extend to the devices within the household that belong to Mr. Wiersma's family members.

Mr. Wiersma has no objection to the proposed Special Conditions of supervised release, with the exception of proposed Special Condition 14:

- Mr. Wiersma objects to Special Condition Number 14, which is not narrowly drawn to advance the goals of supervised release. Per the first part of the condition's terms, the Probation Office would install software that "may restrict and/or record *any and all* activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations." (emphasis added) This is exceptionally overbroad, even if the purpose is to restrict access to clinic websites. As noted in *Kappes*, 782 F.3d at 856, the Probation Office has the ability to install "filtering" software that would be much more narrowly targeted to any legitimate deterrence or rehabilitation aim. The current condition unnecessarily infringes on Mr. Wiersma's Fourth Amendment rights without any basis.

- Further, as established by the PSR, Mr. Wiersma does not have the financial means to pay for monitoring software, and the cost of any monitoring should be waived.

- Mr. Wiersma reserves the right to object to the third element of Condition 14, which forbids use of any device with online computer service without prior approval of the probation officer. Mr. Wiersma assumes that approval will not be unreasonably withheld, particularly with regard to computers at work and

personal cell phones, which are ubiquitous and virtually necessary in today's society.

- The fourth element of Condition 14 is not narrowly tailored and is redundant of Special Condition 6, and should not be imposed. The condition requiring Mr. Wiersma to cooperate in providing financial information is sufficiently tied to his restitution requirement, but there is no basis for requiring Mr. Wiersma to additionally provide phone records or credit card bills.

- Finally, the last element of proposed special condition 14 regarding external storage devices is not appropriate. Mr. Wiersma's offense involved transmission of a threat through the internet. There is no connection to external storage devices in such an offense. It appears that the Probation Office selected a condition that may be appropriate for other computer-based offenses, but is not relevant to Mr. Wiersma's offense and is does not advance any deterrence interest.

## CONCLUSION

Mr. Wiersma maintains that a sentence of twelve months home detention is sufficient, but not greater than necessary to protect the public, § 3553(a)(2)(c); reflect the seriousness of the offense, just punishment and respect for the law, § 3553(a)(2)(A); and take into consideration Mr. Wiersma's personal characteristics and circumstances of the offense that are relevant to sentencing.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By: _s/ Amanda G. Penabad_
Amanda G. Penabad
Attorney for Defendant

FEDERAL DEFENDER PROGRAM
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8340